UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER ALEXA, JEFF MALONE,
and TIM RUGG,

                Plaintiffs,                    Case No. 22-cv-13073
                                              Honorable Linda V. Parker

v.

CITY OF ANN ARBOR,

                Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This lawsuit arises from the COVID-19 pandemic and the mandatory vaccination policy Defendant City of Ann Arbor ("City") adopted in response. The policy required City employees to be vaccinated, or face termination, unless they were granted reasonable medical or religious exemptions. Plaintiffs are former City employees who applied for and were denied religious exemptions. In a Second Amended Complaint, filed April 16, 2025, Plaintiffs allege the following claims against the City: (I) failure to accommodate Plaintiffs' religious beliefs in violation of Title VII of the Civil Rights Act of 1964; (II) disparate treatment discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"); and (III) a 42 U.S.C. § 1983 claim for the violation of the First Amendment's Free Exercise Clause. (ECF No. 63.)

The matter is currently before the Court on the City's motion for partial summary judgment as to Counts II and III of Plaintiffs' Second Amended Complaint.  (ECF No. 92.)  The motion is fully briefed, including a sur-reply which the Court allowed Plaintiffs to file.[1]  (ECF Nos. 113, 122, 123-1.)  Finding the facts and arguments adequately presented in the parties' filings, the Court dispenses with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the City's motion is granted.

## I.      Summary Judgment Standard

The City moves for summary judgment under Federal Rule of Civil Procedure 56.  Under Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential

---

[1] Because the motion has been fully briefed, the Court denies Plaintiffs' motion to stay summary judgment briefing.  (ECF No. 90.)  Plaintiffs also moved to strike the declarations of Margaret Radabaugh, which the City filed in support of its motion.  The Court previously denied that motion.  (*See* ECF No. 168.)

to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record . . .." Fed. R. Civ. P. 56(c)(1).  The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990).  It is not the court's responsibility to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d

3

1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); *see also InterRoyal Corp.*, 889 F.2d at 111 ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The court need not consider any unsupported factual assertions or materials in the record not cited by the parties. *See* Fed. R. Civ. P. 56(c)(3).

## II. Factual Background

### A. City's COVID-19 Vaccination Policy

On August 26, 2021, during the global COVID-19 pandemic and growing concerns for the health and safety of its employees and the public, the City announced its policy requiring "all employees to be fully vaccinated against COVID-19" ("Policy").[2] (ECF No. 76-3 at PageID3628.) The Policy provided that any employee not vaccinated by October 8, 2021—a date later extended to

---

[2] Plaintiffs contend that all City employees were in fact not subject to the Policy, referencing Fifteenth Judicial District Court employees. (*See* ECF No. 113 at PageID.5300-01.) However, pursuant to Michigan Supreme Court precedent, the judiciary has the essential authority over its personnel, not the municipality where the court is located. *Jud. Atty's Ass'n v. State of Mich.*, 586 N.W.2d 894, 899 (Mich. 1998).

November 19, 2021—would be "subject to disciplinary actions that will eventually result in termination[.]"  (*Id*.; ECF No. 63 at PageID. 788 ¶ 1.)  The Policy further provided that "[t]he City will grant reasonable medical and religious exceptions for those who cannot receive a vaccine[.]"  (*Id*.)

Four City employees—two from the Human Resources Department and two from the City Attorney's Office—were tasked with reviewing exemption requests. (ECF No. 60-1 at PageID.1672-73.)  This "Accommodation Team" consisted of Benefits Supervisor Jessica Hull, Employee Benefits and Wellness Specialist Kim Barry, Deputy City Attorney Margaret Radabaugh, and Assistant City Attorney Matthew Thomas.  (*Id*.)  Radabaugh and Thomas' role was to advise Hull and Barry on the law.  (ECF No. 138-2 at PageID.7042; *See also* ECF No. 93.)

Employees seeking a medical exemption were required to submit a request form, which included a Medical Certification signed by a medical provider, identifying the medical reasons why the employee could not be vaccinated.  (ECF No. 76-4 at PageID.3631-34.)  Employees requesting a religious exemption had to complete a request form, which included a written and signed personal statement "detailing the religious basis for [the employee's] vaccination objection, explaining why [the employee is] requesting this religious exemption, the religious principle(s) that guide [the employee's] objections to vaccination, and the religious basis that prohibits the COVID-19 vaccination."  (*Id.* at PageID.3635-38.)  A

completed "Religious Organization Statement Form" from the employee's religious leader was "[r]ecommended" but not required.  (*Id.*)  If the Accommodation Team determined that more information was needed to assess an employee's submission, Hull or Barry contacted the employee.  (ECF No. 32-2 at PageID.587 ¶ 10.)

In the case of a medical exemption request, the City might ask the employee to provide more information from his or her medical provider.  (ECF No. 32-2 at PageID.587, ¶¶ 9-10; ECF No. 92-4 at PageID.4577.)  In the case of a religious exemption, Hull or Barry conducted an "interview" and asked the employee a series of questions to assess the sincerity and/or religious nature of the employee's objection to the vaccine.  (ECF No. 92-4 at PageID.4572-73; ECF No. 32-2 at PageID.587, ¶ 10.)  When formulating the questions to ask, the City relied on Equal Employment Opportunity Commission ("EEOC") guidance relative to assessing the sincerity (i.e., credibility) of an individual's religious beliefs and whether an objection to the vaccine was religious in nature.  (ECF No. 92-4 at PageID.4572-74.)

The general follow up questions were:

(1) "Please describe the nature of your sincerely held religious beliefs[.]"

(2) "What constitutes the basic tenets of the religion?"

(3) "How long have you followed the professed belief?"

> (4) "What is the specific belief, tenet, or observance that conflicts with the vaccination requirement?

(ECF No. 60-2 at PageID.1683.)  In some circumstances, employees were asked how their religious beliefs influenced their diet and lifestyle, and what other medications they have taken.  (*Id*.)  In accordance with EEOC guidance, the City assumed that an employee requesting a religious exemption held a sincerely held religious belief, but looked for indicators undermining the employee's sincerity. (ECF No. 92-4 at PageID.4572-74, 4582, 4587.)

Fifteen (15) City employees submitted medical exemptions requests and sixty-seven (67) submitted religious exemptions requests.  (ECF No. 93-2 at PageID.4565.)  The City granted all medical exemption requests and forty (40) religious exemption requests.  (*Id*.)  Plaintiffs were among the twenty-seven (27) employees whose religious exemption requests were denied.  (*See* ECF No. 95-6.)

**B.      Plaintiff Jennifer Alexa's Exemption Request**

In her personal statement in support of her religious exemption request, Alexa provided the following:

> Our country was founded on our First Amendment freedoms, which includes freedom of religion.  I would rather cultivate immunity through healthy diets and lifestyles, which helps to build the immune system rather than by putting extra chemicals into my body.  In strict accordance with my faith, I refrain from partaking in certain activities and defiling my body in ways contrary to my biblical beliefs.  I have been baptized into my faith and both read the Bible and pray on a regular basis, which demonstrates the sincerity of my religious beliefs.

> I constituency [sic] cannot in good conscience submit myself to injecting a substance synthetic pharmaceutical product into my body in violation of their [sic] deepest and most personal religious beliefs and convictions.

(ECF No. 86-2 at PageID.3851.)  Alexa also submitted a letter she wrote, identifying herself as "a Christian who believes in the Bible, including the teachings in the New Testament." (*Id*. at PageID.3853.)  Quoting different passages from First and Second Corinthians, Alexa shared her belief that her "body is a temple of the Holy Spirit" and that "[i]t is a God-given responsibility and requirement to protect the physical integrity of [her] body against unclean foods and injections." (*Id*.)  Alexa contended that the vaccine, "with its numerous additives and its mechanism for altering [her] body," was "unclean food[.]" (*Id*.)

In a follow-up interview, Alexa shared that her children had been vaccinated, and that she received anesthesia for surgery.[3] (*See* ECF No. 60-2 at

---

[3] Plaintiffs object to the City's use of notes from Alexa's and Malone's interviews as evidence, contending they are unauthenticated because there is no indication of who authored them. (*See* ECF No. 113 at PageID.5316.)  Authentication requires a showing "that the item is what the proponent claims it is." Fed. R. Evid. 901.  While Barry, when shown the notes from Malone's interview, did not recall if she interviewed him (*see* ECF No. 60-4 at PageID.1941), Malone indicated that it was Barry (*see* ECF No. 96-7 at PageID.5095).  Alexa also testified that Barry interviewed her.  (*See* ECF NO. 96-5 at PageID.5049.)  Regardless, Plaintiffs confirmed in their depositions that the contents of the notes accurately reflected their interview responses.  (*See e.g.*, ECF No. 86-9 at PageID.3921-22, 3930-32, 3934-35; ECF No. 92 at PageID.4535-36; ECF No. 86-16 at PageID.4077-82; ECF No. 96-3 at PageID.3862-63, 3859.)  Thus, their deposition testimony provides evidentiary support for the City's factual assertions, even if the notes are not authenticated.

PageID.1683.) She provided that she identified herself as a Presbyterian, and that a basic tenet of the religion, "freedom of choice for your body," meant using home remedies and not taking antibiotics. (*Id.*) Although she identified the specific belief that conflicted with the vaccination to be control over her own body and not injecting chemicals into her body, Alexa indicated that she did not follow a diet where all additives were eliminated. (*Id.*) The City subsequently determined that Alexa's personal statement was copied from a website and that her conduct was inconsistent with her claimed belief that it was wrong to inject a synthetical pharmaceutical substance into one's body. (ECF No. 86-2 at PageID.3852; ECF No. 92-3 at PageID.4565, ¶ 9; ECF No. 92-4 at PageID.4588); *see also* https://perma.cc/7NH2-XEXV.

In their response brief, and relying on Alexa's deposition testimony, Plaintiffs provide that Alexa was opposed to the COVID-19 vaccine because it contained "aborted fetal cells." (ECF No. 113 at PageID.5307 (citing ECF No. 61-1.) During her deposition, Alexa referred to the inclusion of fetal cells in the vaccine when explaining how being vaccinated would violate her belief that only natural substances should be injected into one's body. (ECF No. 61-1 at PageID.2172-72, 2186.) She did not express any religious opposition to abortion as the reason she objected to the vaccine. (*See generally* ECF No. 61-1.) In any event, when seeking a religious exemption from the vaccine mandate, Alexa never

9

shared with the City an objection to the vaccine because fetal cells were used in its development.  (*See* ECF No. 61-1 at PageID.2186-87; ECF No. 86-2.)

The City denied Alexa's request for an exemption.  When Alexa emailed Barry asking why, Barry responded in part:  "The EEOC has identified that the sincerity of an employee's religious belief is largely a matter of credibility.  In this case the credibility of your sincerity has been called into questioned [sic] based on the fact that you copied your *personal statement* from an internet website . . .." (ECF No. 76-7 (emphasis in original).)  The City terminated Alexa for failing to comply with the Policy.  (ECF No. 76-8.)

### C.     Plaintiff Jeff Malone's Exemption Request

In a letter submitted in support of his religious exemption request, Malone identified himself as a Christian, who believes in the New Testament's teaching that one's body is a temple of God, which must be protected from unclean food and injections.  (ECF No. 16 at PageID.4090.)  Malone also quoted from First and Second Corinthians, and asserted that the COVID-19 vaccine, "with its numerous additives and novel mechanism for altering [his] body," was "equivalent of a prohibited 'unclean food' and contrary to [his] faith."  (*Id.*)

Malone relied on the same belief—that the body is a temple of the holy spirit which should not be tainted with unclean substances—during the City's follow-up interview.  (ECF No. 60-2 at PageID.1684.)  He provided that he had been born

10

into Catholicism but was now a member of the Presbyterian church. (*Id.*) He shared that he purchases food from organic shops, and that his now-adult child was vaccinated as a child in accordance with school mandates. (*Id.*) When asked if the letter he submitted in support of his exemption request contained his own words, Malone said they were, except the quotations from the Bible. (*Id.*) The City found the wording of Malone's letter to be very similar to Alexa's and based on the same website. (*Id.*)

Like Alexa, Plaintiffs assert in their response brief that Malone "opposed fetal cells in the development of the vaccine[.]" (ECF No. 113 at PageID.5308.) Malone, like Alexa, testified that he viewed the injection of a vaccine developed with aborted fetal cells to be contrary to his belief that his body is a temple not to be defiled with unclean materials. (*See* ECF No. 61-3 at PageID.2450-51.) However, he also expressed that he opposes abortion for religious reasons. (*Id.* at PageID.2471.) Malone acknowledged that this information was not included in his written submission in support of his exemption request, but testified that he shared this with Barry when she interviewed him. (*Id.* at PageID.2450.)

The City denied Malone's exemption request. (ECF No. 76-5.) Malone was provided the same reason for why his request was denied as Alexa. (*Id.*) Radabaugh indicated during her deposition that Malone's credibility was specifically undermined by the fact that, when expressly asked during his interview

if the words in his personal statement were his own, Malone indicated that they were, except for the Bible quotes, when in fact they were copied from a website. (ECF No. 92-4 at PageID.4575.) Radabaugh explained that other employees who may have copied statements from templates, whose exemption requests were approved, "were honest and credible about the fact they were not the authors." (*Id*.) Malone resigned his employment with the City after his request was denied, indicating that the resignation was "over the COVID-19 vaccination mandate, [his] denied religious exemption, and the threat of termination."[4] (ECF No. 76-10 at PageID.3654.)

### D. Plaintiff Tim Rugg's Exemption Request

Rugg submitted a letter in support of his religious exemption request, in which he stated that "receiving any mRNA substance . . . is against the tenets of my faith practice, that meddling with any part of a living organism's DNA is antithetical to God's plan, and offensive to the Creator." (ECF No. 86-8 at PageID.3915.) Rugg shared his belief that the decision of whether to receive the vaccination was a "personal decision," and that "[w]here scripture does not expressly instruct on a particular matter," he must "search the Scripture" and "seek

---

[4] Plaintiffs contend that Malone was constructively discharged, a claim the City disputes but accepts as true for purposes of its summary judgment motion. (*See* ECF No. 92 at PageID.4531.) For purposes of deciding the motion, the Court assumes it to be true, as well.

12

guidance from the Holy Spirit." (*Id.*)  Rugg indicated that he had "searched the Scripture and sought guidance from the Holy Spirit to come to [his] decision." (*Id.*)  He cited scripture commanding him "to take good care of [his body], not to defile it, and certainly not to introduce something into it that could potentially harm it[.]"  (*Id.*)

Rugg wrote that the vaccine "work[s] as a gene therapy" and thereafter "alter[s] what God made." (*Id.*)  He further wrote that the vaccine "contain[s] carcinogens, neurotoxins, animal viruses, animal blood, allergens, and heavy metals." (*Id.*)  Rugg expressed his belief that the COVID-19 vaccines had not been subject to sufficient testing to be proven safe and effective, and so he viewed them as harmful to his body. (*Id.*)  He identified two virologists who discussed the vaccine's serious and lasting damage to the reproductive ability of men and women. (*Id.*)

During Hull's follow-up interview with Rugg, he described himself as a non-denominational Christian, who believes that man is created in God's image. (ECF No. 86-10 at PageID.4056.)  When asked what specific belief, tenet, or observation conflicted with the COVID-19 vaccine, Rugg spoke about a fallen angel trying to veer you off course, that it is not a serum seen in the past, and that it alters your DNA, which can compromise your body against what God wants. (*Id.*)

13

He expressed that God gave us bodies that can help themselves and ward off invasive threats.  (*Id*.)

When asked if his personal statement contained his own words, Rugg indicated that half were his own, but he obtained some information from the Calvary Chapel website.  (*Id*. at PageID.4057.)  Asked about previous vaccinations, Rugg said he had not been vaccinated in the past twenty years, when he received flu shots.  (*Id*.)  When reminded that he received the Hepatitis A vaccine in 2017 and 2018, Rugg said: "Yes, you're right.  I forgot about that." (*Id*.)  He acknowledged taking antibiotics and steroids and using inhalers when necessary.  (*Id*.)  When asked about his diet, Rugg indicated he consumed a standard diet, was "very healthy," and consumed some alcohol and fast food here and there.  (*Id*.)

> The City denied Rugg's exemption request, providing in part:
>
> The EEOC has identified four factors that can create doubt as to the sincerity of the employee's belief.  One of these includes whether the employee has acted in a way that is inconsistent with the claimed belief.  In this case, your main objection to the COVID-19 vaccine is your belief God says we're not supposed to introduce foreign objects to our body.  Your record with the City is not consistent with this professed belief.  You voluntarily and recently (12/17 and 6/18) received another two-dose vaccine series from the City (Hepatitis A). Additionally, you stated your personal statement was 50% your own, which is contradicted by the fact that your template letter can be found at this website [https://perma.cc/NWY3-TC25].

14

(ECF No. 76-6 at PageID.3642.) The City terminated Rugg for failing to comply with the Policy. (ECF No. 116-3 at PageID.6328.)

### E. Other Exemption Requests

As indicated, the City granted the fifteen (15) medical exemption requests it received and forty (40) of the sixty-seven (67) religious exemption requests submitted. Plaintiffs assert that medical exemption requests were granted based on "food and environmental allergies," "natural immunity," and "anxiety." (ECF No. 122 at PageID.6509 (citing ECF No. 114-31).) The employee with natural immunity, however, also had a history of Anaphylaxis to previous vaccinations, including airway and respiratory issues, leading to emergency intervention. (ECF No. 114-31 at PageID.6186.) The employee with food and environmental allergies, also had previous adverse vaccine reactions and suffers from chronic lung issues. (*Id*. at PageID.6184.) According to the medical provider who prepared the medical certification for the employee with anxiety, the employee also suffered from "panic attacks" and was not "currently mentally able to consent to [the] vaccine."[5] (*Id.* at 6187.)

---

[5] The medical provider also noted that the individual worked solely in an outside capacity. (ECF No. 114-31 at PageID.6187.)

In their response brief, Plaintiffs list fourteen (14) of the forty (40) employees granted religious exemptions and their religions. [6] (*See* ECF No. 113 at PageID.5312.)  Plaintiffs do not identify the religion(s) of the remaining twenty-six (26), and it does not appear to the Court that this information is part of the record. Of the employees whose religions Plaintiffs identify, none appear to be Presbyterian. (*Id.*)

Nick Kaczor is one of the individuals Plaintiffs list whose religious exemption request was granted. (ECF No. 113 at PageID.5312.)  Plaintiffs identify Kaczor as Baptist. (*See id.*)  However, as the City points out in its reply brief (ECF No. 122 at PageID.6509), the information Kaczor provided in support of his exemption request reflects that he is a non-denominational Christian (*see* ECF No. 114-38 at PageID.6202).[7]  Kaczor indicated that he was raised in the Catholic Church but was not Catholic anymore. (Id.)  Kaczor wrote he was baptized, not that he was Baptist. (*Id.*)  Plaintiffs do not dispute this evidence in their sur-reply brief. (*See generally* ECF No. 123-1.)

---

[6] While Plaintiffs cite to the record to support the religions they list for six of the fourteen individuals (*see* ECF No. 113 at PageID.5312 n.1-6), no evidence is cited to support the claimed religions of the remaining eight.

[7] Plaintiffs also identify Chris Warden as a Catholic. (ECF No. 113 at PageID.5313.)  Although indicating that he had been a Catholic, who was baptized, Warden shared that he had grown into a spiritual person and had no defined religion. (ECF No. 114-39 at PageID.6213.)  Warden provided that he had mixed beliefs from different religions, such as Judaism, Buddhism, and Christianity. (*Id.*)

16

## III.     Disparate Treatment Discrimination under ELCRA

### A.     Applicable Law

ELCRA, like Title VII, prohibits employers from discriminating against employees "because of religion[.]"  Mich. Comp. Laws § 37.2202(1)(a).  Plaintiffs allege that the City violated ELCRA by treating them differently than employees of other religions when it denied their religious exemption requests and then terminated them for failing to comply with the COVID-19 vaccination mandate. Proof of such a disparate treatment claim under ELCRA is analyzed under the same evidentiary framework as a claim under Title VII.  *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 912 F.3d 599, 607 (6th Cir. 2019) (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)).

"A plaintiff may show discrimination" either through "direct evidence of discrimination" or "by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)."[8]

---

[8] In their response brief, Plaintiffs discuss a third approach to analyzing disparate treatment claims—a "mixed-motive analysis"—which they contend should be applied here.  The mixed-motive analysis applies "where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives."  *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003)).  "[T]he ultimate question at summary judgment on a mixed-motive case is whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that a protected characteristic was *a motivating factor* in the defendant's adverse employment action against the plaintiff."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006) (cleaned up).  If the Court finds

17

*Redlin*, 912 F.3d at 606 (citation omitted).  "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful [discrimination] was a motivating factor in the employer's action."  *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 349 (6th Cir. 2021) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008)).  Direct evidence "must prove not only discriminatory animus, but also that the employer actually acted on that animus."  *Johnson v. Metro Gov't of Nashville & Davidson Cnty.*, 502 F. App'x 523, 534 (6th Cir. 2012) (citing *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006)).

Examples of direct evidence include "[a] facially discriminatory employment policy or a . . . decisionmaker's express statement of a desire to remove employees in the protected group[.]"  *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).  Examples of the latter include "repeated negative statements made by a decision maker regarding the age of older workers; racial slurs by a manager; and statements to an applicant that a county would not hire a female emergency medical technician."  *See Eskridge v. Nissan N.A., Inc.*, No. 3:06-0677, 2008 WL 471687, at *7 (M.D. Tenn. Feb. 19, 2008)

---

evidence that Plaintiffs' religions were a motivating factor in the City's decision to deny their exemption requests, it will consider this analysis.

(citing *Kresnak v. City of Muskegon Heights*, 956 F. Supp. 1327, 1335 (W.D.Mich.1997) (collecting cases)).  Direct evidence also is a decisionmaker's statement on two occasions that he would not promote the plaintiff because of her sex, *Laderach v. U-Haul of N.W. Ohio*, 207 F.3d 826, 829 (6th Cir. 2000), and evidence that the plaintiff's supervisor and a decisionmaker "specifically[,] negatively[,] and derogatorily referenced [the plaintiff's] Italian-American heritage" three weeks before his termination, *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004).  If the plaintiff produces direct evidence of discrimination, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."  *Jackson*, 999 F.3d at 349 (citing *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015)).

Where direct evidence is not presented, and the *McDonnell Douglas* framework applies, the plaintiff must first establish a prima facie case of discrimination by showing that the plaintiff: (1) "was a member of a protected class;" (2) "was qualified for his [or her] job;" (3) "suffered an adverse employment decision;" and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees."  *Redlin*, 921 F.3d at 606-07 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)).  If the plaintiff demonstrates a prima facie case of

19

discrimination, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 607 (internal quotation marks and citation omitted). If the employer makes such a showing, "the plaintiff them must prove by a preponderance of the evidence that the state reasons were a pretext for discrimination." *Id*. (citation omitted).

"To survive summary judgment, a plaintiff 'must produce sufficient evidence from which a jury could reasonably reject the defendant's explanation of why it' took an adverse employment action against the plaintiff." *Redlin*, 921 F.3d at 612 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." *Id.* (quoting *Chen*, 580 F.3d at 400 n.4).

### 1.      Direct or Indirect Evidence

Plaintiffs claim to have direct evidence of discrimination, although they seem to misunderstand what direct evidence is. Purportedly quoting from the Michigan Supreme Court's decision in *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186 (2003), Plaintiffs first assert that they "can prove disparate treatment . . . with direct evidence if 'the need for an accommodation was a motivating favor in the employer's decision.'" (ECF No. 113 at PageID.5320

20

(quoting *Sniecinski*, 666 N.W.2d at 192).)  Quoting from the same sentence a page later to explain direct evidence, Plaintiffs provide "that 'direct evidence' occurs where 'unlawful discrimination was at least a motivating factor in the employer's action."  (*Id.* at PageID.5321 (quoting *Sniecinski*, 666 N.W.2d at 133).)

First, the word "accommodation" appears nowhere in the Michigan Supreme Court's decision.  More significantly, Plaintiffs omit significant words from the sentence they quote.  What the Supreme Court in fact said is:

> We have previously cited with approval the United States Court of Appeals for the Sixth Circuit's definition of " 'direct evidence' as 'evidence which, if believed, *requires the conclusion* that unlawful discrimination was at least a motivating factor in the employer's actions.'"

*Sniecinski*, 666 N.W.2d at 192 (emphasis added) (quoting *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520 (Mich. 2001) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).

Plaintiffs identify the following as "direct evidence":

> (a) judging certain religious beliefs as better than others, (b) lying about termination reasons (or at best not having any objective criteria), (c) being woefully inconsistent, (d) ignoring guidance, and (f) relying on junk theories like over-the-counter medications being developed with fetal cells.

(ECF No. 113 at PageID.5321-22.)  Only the first might constitute "evidence which, if believed, requires no inference to conclude that unlawful [discrimination] was a motivating factor in the [City]'s action," *if* Plaintiffs in fact produced

evidence to support it.  However, Plaintiffs do not present any evidence showing that the City "judg[ed] certain religious beliefs as better than others"—for example, a statement by any decisionmaker that the religious beliefs of the employees granted exemptions were better or more worthy of protection than Plaintiffs' asserted beliefs.

The Policy, which categorically allowed for "religious exemptions," did not facially discriminate against any religion.  Plaintiffs do not point to a statement by, or any expression from, a City official—much less a decisionmaker—that certain religious beliefs were more worthy of receiving an exemption or being treated more favorably otherwise.

Plaintiffs refer to statements made by Assistant City Administrator, John Fournier, during a meeting with City employees.  (ECF No. 113 at PageID.5301.) According to Alexa, Fournier indicated that the City was "not going to grant all religious accommodation requests" and would "not be handing them out like candy."[9]  (ECF No. 113-20 at PageID.5657, ¶ 4.)  Plaintiffs also point to Fournier's statement in an email that the City wanted its mandate to be "as strict as we are legally able to make it."[10]  (ECF No. 113-19 at PageID.5654.)  None of

_____

[9] Alexa presumed Fournier meant "religious exemptions" when he said "them." (ECF No. 113-20 at PageID.5657, ¶ 4.)  The City takes issue with this assumption; however, the Court finds it to be one a jury could reasonably make.

[10] Notably, this statement was contained in Fournier's communication to all City employees about the State's recently passed budget, which contained language

22

these statements constitute direct evidence of religious animus.  In other words, an inference would have to be made to find from them that the City harbored religious animus and acted on that animus when denying religious exemption requests.

Plaintiffs contend "[t]hat it is 'disparate treatment *per se*'" when "Barry and Hull had no training on religious accommodation but were given the reins of a process that denied [exemptions to] Presbyterians (including Alexa and Malone) and Non-Denominational Christians (including Rugg)."  (ECF No. 113 at PageID.5322.)  Plaintiffs' assertion that Barry and Hull had no training is not supported or misstates the evidence.  It also ignores evidence that Radabaugh and Thomas were tasked with providing guidance to Barry and Hull on the law.  Moreover, it is not direct evidence of religious animus, or that religious animus motivated the decision to deny any request.

---

attempting to invalidate local government vaccine mandates.  (ECF No. 113-19 at PageID.5654.)  Fournier wrote that the City did not believe the budget's language could be legally upheld, but even if it could, the City "still ha[s] flexibility to implement a vaccine mandate in some form."  (*Id.*)  He also wrote that City Council had passed a resolution "unanimously endors[ing] the vaccine mandate and directed the City Attorney to provide legal options in response to this budget language."  (*Id.*)  Fournier informed the employees that, in the meantime, the City was extending the deadline for employees to comply with its vaccine mandate.  (*Id.*)  In context, the statement Plaintiffs focus on simply conveyed that the City remained committed to a vaccine mandate, but one which complied with the law.  It could not be reasonably interpreted as expressing religious animus.

For these reasons, Plaintiffs do not proffer direct evidence of religious discrimination.  Thus, the Court turns to the framework applicable when direct evidence is lacking.

### 2.    Plaintiffs' Prima Facie Case

The City contends that Plaintiffs cannot establish the fourth prong of their prima facie case—i.e., that the City treated similarly situated employees outside Plaintiffs' protected class differently.  To be similarly situated, Plaintiffs and the individuals they use as comparators "must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them."  *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023) (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010)).

The Court first addresses Plaintiffs' attempt to compare themselves to employees who received medical exemption requests.  As other courts have noted in similar cases involving COVID-19 vaccine mandates and exemptions, at the summary judgment stage, it is insufficient to compare oneself to individuals who received a medical exemption as "[m]edical exemption requests and religious exemption requests are on their face fundamentally different."  *Savel v. MetroHealth Sys.*, No. 22-cv-02154, 2024 WL 4581542, at *13 (N.D. Ohio Oct.

24

25, 2024), *aff'd* No. 24-4025, 2025 WL 1826674 (6th Cir. July 2, 2025) [11]; *Brown v. MGM Grand Casino*, No. 22-cv-12978, 2024 WL 4819575, at * (E.D. Mich. Nov. 18, 2024) (concluding that the plaintiff, who requested a religious exemption to the defendant's vaccine policy was not similarly situated to an employee who received a medical exemption as the "[d]efendant had to evaluate religious accommodation requests and medical accommodation requests under different legal standards").  A comparison between individuals who received medical exemption requests and those denied religious exemption requests might be convincing if the City had denied *all* religious exemptions requests, as that could suggest animus to religious beliefs, generally.  *See, e.g. Brandon v. Bd. of Educ. of the City of St. Louis*, No. 22-cv-00635, 2025 WL 1360684 (E.D. Mo. May 8, 2025) (finding individuals who received medical exemptions to be proper comparators to those denied religious exemptions where the defendant "denied *every single*" religious exemption request—there were 189—but granted more than half of the

---

[11] *Savel* reached the Sixth Circuit twice.  The first time was on review of the district court's decision granting the defendant's motion to dismiss.  96 F.4th 932 (6th Cir. 2024).  The appellate court held that the plaintiff's allegation that the defendant treated medical requests more favorably than religious ones by blanket-denying all religious requests while granting some medical ones, was sufficient. *Id*. at 944.  The case then came to the Sixth Circuit after the district court granted the defendant's summary judgment motion.  2025 WL 1826674.  Then the court held that the plaintiff failed to show that similarly-situated employees were treated differently by relying on the defendant's grant of a medical exemption request.  *Id*. at *3.  The court pointed out that the plaintiff failed to show that the different types of requests were subject to the same standards.  *Id*.

25

submitted medical exemption requests) (emphasis added). But those are not the facts here, where the City granted almost 60% of the religious exemption requests it received.

Plaintiffs try to show the City's animosity toward Presbyterians (Alexa and Malone) and Non-Denominational Christians (Rugg) because the fourteen (14) employees they list, who were granted religious exemptions, were purportedly not Presbyterian or Non-Denominational Christians. There are several flaws with Plaintiffs' argument, however. First, it is factually incorrect as Kaczor, who was granted an exemption, identifies as Non-Denominational Christian, even though he was raised Catholic. Second, while Plaintiffs identify the religions of fourteen (14) employees granted religious exemptions, the record fails to reveal the religions of the remaining twenty-six (26). Finally, of the fourteen individuals Plaintiffs do list, many of them, like Plaintiffs, are *Christians*.

The Court finds no support for Plaintiffs' attempt to carve out protected classes based on the different sects of Christianity. At least two district courts have held that the protected class is "Christians," not the different sects of Christianity to which a plaintiff and a comparator belong. *See Lindsey v. Bridge Rehab, Inc.*, 369 F. Supp. 3d 1204, 1211 (N.D. Ala. 2019) (finding that it was "fatal" to the plaintiff's disparate treatment claim that her comparator was also Christian, even if she was a member of a different Christian denomination, and indicating that the

26

plaintiff cited no "legal authority for the proposition that different denominations of Christianity are categorically different protected classes"); *Brown v. Alaska Airlines, Inc.*, No. 22-cv-668, 2024 WL 2325058, at *9 (W.D. Wash. May 22, 2024) (finding that none of the plaintiffs' comparators were outside the claimed protected class (to wit, non-Christian or non-religious); *see also Varkonyi v. United Launch Alliance, LLC*, No. 23-cv-00359, 2023 WL 4291649, at *3 (C.D. Cal. May 12, 2023) (dismissing unlawful termination claim of Christian plaintiff who failed to allege "that similarly situated non-Christian or nonreligious individuals were treated more favorable than he was").

Of course, as the district court in *Lindsey* acknowledged, a Christian plaintiff could use another Christian as a comparator *if* the plaintiff showed that their religious beliefs, observances, and/or practices differed.  369 F. Supp.3d at 1211-12.  This is because Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief."  *Id.* (quoting 42 U.S.C. § 2000e(j)).[12] However, the plaintiff must at least identify what those differences are when the plaintiff and his or her comparator(s) are Christian.  As the *Lindsey* court explained:

---

[12] Unlike Title VII, ELCRA does not define "religion."  However, the Court assumes the Michigan courts would adopt Title VII's definition.  *See Rodrigues v. Delta Airlines*, 644 F. App'x 629, 633 (6th Cir. 2016) ("When construing the ELCRA, Michigan courts look to federal Title VII jurisprudence to guide their interpretation.").

> Even assuming that different denominations of Christianity could constitute different "aspects of religious observance and practice" such that disparate treatment of employees from different denominations could be discrimination on the basis of religion, no record evidence exists of the different observances, practices, and beliefs between the two specific denominations in this case. And while a plaintiff would not necessarily have to present evidence of the differences between, for example Christianity and Islam to show that Christians and Muslims belong to different protected classes, the court cannot say that the same categorical distinction applies to different Christian denominations without any supporting evidence.

*Id.* Like the plaintiff in *Lindsey*, Plaintiffs do not attempt to show that their religious observances, practices, and/or beliefs differed from the Christians they use as comparators.

In fact, the City granted religious exemptions to employees who expressed the exact religious beliefs that Plaintiffs did in support of their requests. For example, like Plaintiffs, Jessica Baker, Chris Warden, and Jeremy Flack described their bodies as God-created or temples into which unclean substances, like the vaccine, should not be injected or ingested. (*See* ECF No. 95-7; ECF No. 95-9; ECF NO. 95-14; ECF No. 114-39.) Ron Robbins, James Clare, Nick Kaczor, Michael Ligon, Warden, and Flack, like Plaintiffs, expressed that their religious beliefs preclude them from injecting a vaccine containing aborted fetal cells. (ECF No. 114-35; ECF No. 95-14; ECF No. 114-32; ECF No. 114-39; ECF No. 95-14; ECF No. 114-38; ECF No. 114-42.)

28

For these reasons, Plaintiffs' comparators are not "outside" Plaintiffs' protected class. Therefore, Plaintiffs fail to show that individuals outside of their protected class were treated differently. They do not establish a prima facie case of disparate treatment discrimination. Nevertheless, the Court will proceed through the *McDonell Douglas* framework to be thorough.

### 2. Legitimate Non-Discriminatory Reason & Pretext

The City denied Plaintiffs' exemption requests because it doubted the sincerity of their religious beliefs.[13] Contrary to Plaintiffs' assertion, the City provides admissible evidence to support its reason for denying Plaintiffs' requests.

---

[13] Plaintiffs assert that the City's reason fails "because it does not point to a criteria or uniform policy"—presumably for assessing sincerity. (ECF No. 113 at PageID.5327.) The evidence reflects, however, that the City relied on EEOC guidance and the law when deciding what it could not question (e.g., the correctness of an asserted belief), what it could question (i.e., the sincerity and religious nature of the belief), and the relevant questions and considerations for assessing what is open for review.

Importantly, there is no evidence that the City questioned the centrality, authenticity, or substance of any particular belief or practice claimed by Plaintiffs. Instead, it questioned whether Plaintiffs sincerely held those beliefs. "Sincerity is distinct from reasonableness." *Fox v. Washington*, 949 F.3d 270, 277 (6th Cir. 2020) (quoting *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 586 (6th Cir. 2018)). An employer may not lawfully contest the accuracy of an employee's claimed religious beliefs or claim that it is not religious because it does not correspond with any specific religion. *Bilyeu v. UT-Battelle, LLC*, 154 F.4th 396, 406 n.3 (6th Cir. 2025) (citing *Truskey v. Vilsack*, No. 21-5821, 2022 WL 3572980, at *2 (6th Cir. Aug. 19, 2021)). However, an employer "can question whether the employee actually holds the asserted belief and whether it is in fact religious." *Id.* (citing *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378-79 (6th Cir. 1994)

(*See e.g.*, ECF No. 92-3 at PageID.4565 ¶¶ 9, 11; ECF No. 92-4 at PageID.4575, 4576.) As set forth in Section II earlier, the City's decisionmakers questioned Alexa's credibility because she copied her personal statement from a website and claimed injecting a synthetic pharmaceutical product violated her beliefs, but admitted that she received anesthesia and vaccinated her children. Rugg's credibility was undermined by the fact that he, too, copied his personal statement, but when asked, claimed half of it was his own words. Additionally, he was previously vaccinated (although he denied previous vaccination until reminded by the interviewer), and acknowledged taking antibiotics, steroids, and using an inhaler, which undermined the credibility of his claim that his religious beliefs would be violated if he were required to introduce "harmful" substances into his body. The City did not find Malone to be credible because he copied his statement, but claimed it was his own words, and vaccinated his children.

As also stated earlier, Plaintiffs can show that the City's reason was a pretext for religious discrimination by presenting evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin*, 921 F.3d at 612 (quoting *Chen*, 580 F.3d at 400) (brackets removed). Responding to criticism of its segmentation of the pretext inquiry into those three categories, the Sixth Circuit has explained that it "ha[s] never regarded

30

those categories as anything more than a convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (2012) (quoting *Chen*, 580 F.3d at 400 n.4). As the court further explained, "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen*, 580 F.3d at 400 n.4 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 515 (1993)).

Plaintiffs make several assertions to show that the City's stated reason for denying their exemption requests was a pretext for religious discrimination. Plaintiffs claim the City "l[ied] about termination reasons (or at best not having any objective criteria)," was "woefully inconsistent" when evaluating employees' requests, "ignored [the EEOC's] guidance," and "rel[ied] on junk theories[.]" (ECF No. 113 at PageID.5322.) They point to the grant of exemptions to employees who had the same "problems" in their submissions as Plaintiffs, such as using internet templates, failing to initially admit to receiving vaccinations in the past, vaccinating their children, and/or receiving anesthesia and/or using OTC medications. Noting the expanded explanations the City has provided for denying their exemption requests, which were not included in the initial notifications explaining why the requests were denied, Plaintiffs claim the City's reasons "shifted over time."

31

"Establishing that the employer's reason was a pretext requires that a plaintiff *do more than simply impugn the legitimacy of the asserted justification*[.]" *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 608-09 (6th Cir. 2013) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 805-08 (6th Cir. 1994)) (emphasis added in *Carter*).  "'A case alleging unlawful [discrimination] is not a vehicle for litigating the accuracy of the employer's grounds' for the adverse employment action." *Strickland v. City of Detroit*, 995 F.3d 495, 512 (6th Cir. 2021) (quoting *Tingle*, 692 F.3d at 530).  "If an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e., the adverse action), then the employee will not be able to establish pretext." *Tingle*, 692 F.3d at 530-31 (citing *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106-1117 (6th Cir. 2001)).  Stated differently, "when an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Id*. at 531 (quoting *Chen*, 580 F.3d at 401).

A plaintiff can undercut an employer's honest belief by producing evidence establishing that the employer's decision was not reasonably informed and considered, thereby making its decisional process "unworthy of credence." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (internal citation

32

omitted).  A plaintiff also can undermine an employer's honest-belief argument by showing "that an error by the employer was 'too obvious to be unintentional.'" *Tingle*, 692 F.3d at 531 (internal citation omitted).  Nevertheless, the plaintiff "must allege more than a dispute over the facts" on which the decision was based. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).  The Sixth Circuit does "not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (1998). As the Sixth Circuit also explained in *Griffin* and *Carter*:

> Summary judgment for the defendant may be appropriate even after the plaintiff has presented evidence that the defendant's proffered reason for the termination was false "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiffs created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Carter*, 529 F. App'x at 610 (quoting *Griffin*, 689 F.3d at 593-94).

Plaintiffs' evidence may suggest that the City's review of the religious exemption requests was not perfect.  Nevertheless, the City's decision-making process is in no way comparable to that in *Barnett v. Inova Health Care Services*, 125 F.4th 465, 472 (4th Cir. 2025), as Plaintiffs argue.  (*See* ECF No. 113 at PageID.5325.)  There is no evidence suggesting the City judged the legitimacy of Plaintiffs' or any employee's beliefs.  The City relied on EEOC guidance to formulate questions to evaluate the sincerity of an employee's religious beliefs.

33

There is no evidence that the City granted exemptions to employees with "more conventional beliefs" while denying exemptions to individuals holding "less known or respected religious beliefs."  Presbyterians and Non-Denominational Christians do not seem to fall within the latter category.[14]

There also is no evidence supporting Plaintiffs' assertion that the decisionmakers ignored EEOC guidance.  Nor is there evidence suggesting that the City's decisions were not "reasonably informed" or "considered," *see Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998), or that they were not based "on the particularized facts that were before it at the time the decision was made," *Majewski*, 274 F.3d at 1117.  While the submissions or interview responses of some employees granted religious exemptions share some of the same problems the City found in the submissions and answers provided by Plaintiffs, the City points out distinctions which led to the decisionmakers' conclusions that Plaintiffs were not credible.  (*See* ECF No. 122 at PageID.6514-15.)

However, even if the City did find the same problems in Plaintiffs' submissions and answers that it found in those of individuals granted religious exemptions, as discussed earlier, both groups based their exemption requests on identical religious beliefs.  The fact that the City granted exemptions to other

---

[14] According to a recent CBS News article and the General Source Survey, 14% of Americans identify as nondenominal Christians.  *See https://perma.cc/B7MU-EEAD*; https://perma.cc/4BVV-A4LT.

Christian employees and to employees citing the same religious beliefs in support of their requests, wholly undermines Plaintiffs' claim that the City's reason for denying their request was a pretext *for religious discrimination*.  In other words, a jury could only conclude that the City's decisions to deny Plaintiffs' exemption requests were based on something other than religion.

**IV.    First Amendment Free Exercise Clause**

**A.     Applicable Law**

The First Amendment to the United States Constitution, which is applicable to the States through the Fourteenth Amendment, prohibits governments from "abridging the freedom of speech" and "prohibiting the free exercise of religion." U.S. Const. amend. I.  "[A] policy that forces a person to choose between observing [the person's] religious beliefs and receiving a generally available government benefit for which [the person] is otherwise qualified burdens [the person's] free exercise rights."  *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 731 (6th Cir. 2021) (citing *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 465 (2017)).  A policy burdening the free exercise of religion is generally unlawful unless it survives strict scrutiny—i.e., it "serves 'interests of the highest order and is narrowly tailored to achieve those interests.'"  *Dahl*, 15 F.4th at 734-35 (quoting *Fulton*, 593 U.S. at 541).  However, "laws incidentally burdening religion are

ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 593 U.S. at 533 (citing *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878-882 (1990)). A neutral and generally applicable law is subject only to rational basis review. *Smith*, 494 U.S. at 878-79.

"Neutral" in the context of a free exercise claim means that the law or policy does not distinguish "among religions" or "between religion and non-religion." *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir. 1995); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("*Lukumi*") ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion, or of religion in general."). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 636-39 (2018); *Lukumi*, 508 U.S. at 533). Summarizing Supreme Court precedent addressing the issue, the Second Circuit Court of Appeals provided:

> A law may not be generally applicable . . . for either of two reasons: first, "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions"; or, second, "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."

*Kane v. De Blasio*, 19 F.4th 152, 165 (2021) (quoting *Fulton*, 593 U.S. at 534).

36

However, "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons." *We The Patriots, USA, Inc. v. Hochul*, 17 F.4th 266, 288 (2d Cir. 2021) (citing *303 Creative LLC v. Elenis*, 6 F4th 1160, 1187 (10th Cir. 2021), *rev'd on other ground* 600 U.S. 570 (2023); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1081-82 (9th Cir. 2015); *InterCmty. Ctr. for Just. & Peace v. INS*, 910 F.2d 42, 45 (2d Cir. 1990)); *see also Kane*, 19 F.4th at 165. "Rather, there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." *Kane*, 19 F.4th at 165 (citing *We The Patriots*, 17 F.4th at 288); *see also We The Patriots*, 17 F.4th at 165 (citing *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007)) ("The 'mere existence of an exemption procedure,' absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny.").

In *Dahl*, the Sixth Circuit held that Western Michigan University's COVID-19 vaccination policy was not neutral and generally applicable because the plaintiffs showed that the exemption procedures allowed the university to treat secularly motivated conduct more favorably than religiously motivated conduct. 15 F.4th at 733. While the university's policy provided express categorical

37

exemptions for medical and religious reasons, it also expressly allowed for the consideration of requests "on an individual basis." *Id.* at 730.  And despite the provision for secular and nonsecular exemptions, the university denied or failed to consider every religious exemption request it received.  *Id.* at 733-34.  As such, the university refused to extend its system of individual exemptions to cases of religious hardship, and the Sixth Circuit found that it did so without compelling reason.  *Id.* at 733 (citing *Fulton*, 593 U.S. at 534).

Numerous courts have found laws and policies to be neutral and generally applicable despite categorical exemptions where the exemptions do not "treat secular conduct more favorably than comparable religious conduct," and the evidence at most showed individualized evaluations to assess whether the requestor was legally entitled to an exemption.  *See, e.g., Kane*, 19 F.4th at 165-66 (quoting *We the Patriots USA*, 17 F.4th at 288); *see also 303 Creative LLC*, 6 F.4th at 1187 (quoting *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004)) (explaining that "an exemption is not 'individualized' simply because it 'contains express objections for objectively defined categories of persons'"); *Pilz v. Inslee*, No. 22-35508, 2023 WL 8866565, at *2 (9th Cir. Dec. 22, 2023) (quoting *Lukumi*, 508 U.S. at 533) (alterations removed) (finding State policy requiring COVID-19 vaccination unless employee received medical or religious exemptions to be valid and neutral, "because it neither infringes upon nor restricts practices because of

their religious motivation" and "applies to all relevant employees unless they can show that they are legally entitled to an exemption"); *Ferrelli v. Unified Ct. Sys.*, No. 22-cv-0068, 2022 WL 673863, at *6-8 (N.D.N.Y. Mar. 7, 2022) (finding vaccine mandate requiring all judges and employees to get vaccinated, but including exemptions for valid religious or medical reasons, to be a valid and neutral law of general applicability); *UnifySCC v. Cody*, No. 22-cv-01019, 2022 WL 2357068, at *6-7 (N.D. Cal. June 30, 2022) (quoting *Kane*, 19 F.4th at 165) (finding county's COVID-19 vaccine mandate to be neutral, despite the inclusion of categorical exemptions, because those exemptions do not "allow secularly motivated conduct to be favored over religiously motivated conduct"); *Ciseneroz v. City of Chicago*, No. 21-cv-5818, 2021 WL 5630778, at *3 (N.D. Ill. Dec. 1, 2021) (finding city policy requiring all employees to be fully vaccinated against COVID-19 absent an approved medical or religious accommodation to be a neutral law as it "equally applies to all City employees, regardless of religious belief or affiliation").  In *Rizzo v. New York City Department of Sanitation*, No. 23-cv-7190, 2024 WL 3274455 (S.D.N.Y. July 2, 2024), the district court distinguished the vaccine mandate in *Dahl* from the one adopted by the New York Department of Sanitation ("NYDS"), because the NYDS mandate, while allowing for exemptions for medical or religious reasons, "did not sanction exemptions on an entirely discretionary basis[.]" *Id.* at *6 n.2.  The court collected a string of decisions

39

rejecting Free Exercise Clause challenges to COVID-19 vaccine mandates because they similarly applied to all employees and allowed for medical and religious accommodations. *Id.* at \*5.

In *UnifySCC*, the District Court for the Northern District of California distinguished *Dahl* and the Supreme Court's decision in *Fulton* for similar reasons. 2025 WL 215524. As the court read *Dahl*, "the concern was that the individualized approval of exemptions 'invite[d] the government to decide *which reasons* for not complying with the policy are worthy of solicitude." *Id*. at \*11 (adding brackets and emphasis) (quoting *Dahl*, 15 F.4th at 734). "In other words, the government entity in question had discretion to subjectively evaluate whether a religious rationale was adequate to permit exemption from the applicable rule." *Id.* The problem in *Fulton*, the *UnifySCC* court explained, was that "a government commissioner had 'sole discretion' to decide whether to grant a religious exemption," and "the city made clear that the Commissioner 'had no intention of granting an exception' to a religious entity[.]" 2025 WL 215524, at \*11 (quoting *Fulton*, 593 U.S. at 535, 541).

In *Ferrelli*, the court identified two reasons why the Supreme Court's reference to "a mechanism for individualized exemptions" should not be interpreted as encapsulating all laws or policies permitting categorical exemptions:

> First, such an interpretation would create a perverse incentive for government entities to provide no religious exemption process in

40

order to avoid strict scrutiny. *We The Patriots*, 17 F.4th at 281-90. Second, and more importantly, when read in context, each passage of *Fulton* [discussing a mechanism for individualized exemptions] refers to exemption processes that provide the decisionmaker with discretion to favor secular justifications for exemptions over religious justifications. [593 U.S. at 533-34]. The *Fulton* Court emphasized that "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at [534]. The *Fulton* Court also cited the example of *Sherbert v. Verner*, 374 U.S. 398 (1963), where a Seventh-Day Adventist was denied unemployment benefits because her refusal to work on Saturdays did not qualify as "good cause" for failing to accept available suitable work. *Id.* Finally, . . . the *Fulton* Court found that where "a system of individual exemptions exists, 'the government may not refuse to extend that system to cases of religious hardship without a compelling reason.'" . . . [*Id.*].

*Ferrelli*, 2022 WL 673863, at *7. The Tenth Circuit in *Axson-Flynn* reasoned that "[w]hile of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption"—for example, here, deciding whether a person holds a *sincere* religious belief to qualify for a religious exemption—"that kind of limited yes-or-no inquiry . . . is qualitatively different from the kind of case-by-case system envisioned by the [Supreme Court in] *Smith* Court . . ." *Axson-Flynn*, 356 F.3d at 1298.

## B.   Analysis

### 1.   Whether the Policy is Neutral and Generally Applicable

The City's Policy is similar to those found to be neutral and generally applicable in the cases discussed in the preceding section. It categorically provided

41

for religious and medical, exemptions. It did not favor secular activity over religion.

Unlike the mandate in *Dahl*, the City's decisionmakers were required to grant exemptions to individuals found to have sincerely held religious beliefs. The individualized assessment here did not permit decisionmakers to decide which religious beliefs were "worthy of solicitude" and which were not. Religious beliefs were assumed to be correct. The only questions left for the City's decisionmakers were whether the expressed beliefs were in fact religious in nature and whether they were sincerely held.

Although the assessment of whether an employee's beliefs were sincerely held involved a subjective determination, it was guided by the law and is one employers may make. There is no evidence that the City's decisionmakers exercised their discretion to favor secular conduct over religious conduct. In fact, the City approved almost 60% of the religious exemption requests it received.

For these reasons, the Court finds the Policy to be neutral and generally applicable. It is, therefore, subject to rational basis review.

### 2. Rational Basis Review

To survive rational basis review, the Policy must have been "rationally related to a legitimate government interest." *Doe No. 1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, a *6 (6th Cir. Aug. 26, 2025)

42

(citing *Lukumi*, 508 U.S. at 531).  "Plaintiffs bear the heavy burden of showing that no possible justification for the [P]olicy exists."  *Norris v. Stanley*, 73 F.4th 431, 437 (6th Cir. 2023) (citing *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005)).

The City maintains that the Policy furthered public health and safety by reducing the spread of COVID-19.  (ECF No. 92 at PageID.4551.)  In *Norris*, the Sixth Circuit found that "[p]ublic health and safety easily fall within the state's legitimate interests[,]" and "[s]temming the spread of COVID-19 is unquestionably a compelling interest."  73 F.4th at 436 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020)).

Plaintiffs do not address whether the Policy survives rational basis review in their response brief or their sur-reply brief.  Nor do they address the City's claim that any as-applied challenge survives rational basis review.  Plaintiffs therefore fail to meet their "heavy burden of showing that no possible rational justification for the [P]olicy exists."  *Norris*, 73 F.4th at 437 (citing *Midkiff*, 409 F.3d at 770).  They have forfeited any argument that the Policy fails under this standard of review.[15]  *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013)

---

[15] In its reply brief, the City asserted that Plaintiffs "conceded" that a rational basis could be found for the Policy due to their failure to address the issue.  (ECF No. 122 at PageID.6518.)  Plaintiffs addressed this assertion in their sur-reply brief by stating:  "Defendant must not have read the response brief and all of the argument regarding *Kane v. de Blasio*, 19 F.4th 152 (2d Cir. 2021).  (ECF No. 123-1 at

43

(finding arguments not raised and those adverted to in only a perfunctory manner forfeited) (citation omitted); *see also Herring v. City of Ecorse*, No. 24-1916, 2025 WL 2105263, at *5 (6th Cir. Sept. 16, 2024) (quoting *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019)) (recognizing that the Sixth Circuit has used "waiver" and "forfeiture" interchangeably sometimes, but explaining that "[w]aiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right").

Thus, the Court finds a rational basis for the City's COVID-19 vaccine mandate. But even if the Policy is subject to strict scrutiny review, it still passes muster.

### 3.    Strict Scrutiny Review

To survive strict scrutiny, the City must show that the Policy was "'narrowly tailored' to serve a 'compelling' state interest." *Roman Cath. Diocese*, 592 U.S. at 18 (quoting *Lukumi*, 508 U.S. at 546); *see also Fulton*, 593 U.S. at 541 (indicating that it is the government's burden to make this showing to survive strict scrutiny). As discussed in the preceding section, the Supreme Court has found "[s]temming the spread of COVID-19" to "unquestionably be a compelling interest[.]" *Id.*; *see*

PageID.6548.)  Plaintiffs then state that they argued *Kane* to show that strict scrutiny applies here. (*Id.*)  Argument as to which standard of review applies is not the same thing as proof that the Policy fails under one of those standards. As indicated, Plaintiffs bore the burden to show no rational justification for the Policy.

44

*also Dahl*, 15 F.4th at 735 ("The University's interest in fighting COVID-19 is compelling.").

As to whether the Policy was narrowly tailored to serve those interests, the City presents evidence to show that "vaccines remain the most effective single means to control the spread of the COVID-19 virus and minimize severe disease outcomes." (ECF No. 116-4 at PageID.6335.) As one district court found, "the gold standard to prevent and stop the spread of communicable diseases, including COVID-19, is vaccination." *Does 1-6 v. Mills*, 566 F. Supp. 3d 34, 53 (D. Me. 2021) (citation omitted). The City also presents evidence that "while other interventions, such as improved ventilation, social distancing, and wearing masks can be highly effective in reducing disease spread, depending on the circumstances, widespread vaccination is clearly the single most effective way to prevent the spread of disease." (ECF No. 116-4 at PageID.6337, 6339.)

In *Dahl*, the Sixth Circuit held that the university's policy, requiring only student-athletes to be vaccinated, was not narrowly tailored. 14 F.3d at 735. The court reasoned that "public health measures are not narrowly tailored if they allow similar conduct that 'creates a more serious health risk.'" *Id.* (quoting *Roman Cath. Diocese*, 592 U.S. at 19). The court found that to be the case with a policy allowing "non-athletes—the vast majority of [the university's] students—to remain

45

unvaccinated." *Id*.  Here, in comparison, the City's Policy applied to *all* employees with limited categorical exceptions.

Plaintiffs provide a superficial or at least vague response to the City's strict scrutiny analysis.  They seem to argue that their exemption requests should have been granted, regardless of the conclusion that their beliefs were not religious or not sincere, because the City already had a high vaccination rate, granted most religious and all medical requests, and "had a less restrictive means of achieving safety goals, such as wearing face coverings in common areas, screenings, social distancing, and promoting telework."  (ECF No. 113 at PageID.5335.)  Yet Plaintiffs fail to refute the City's evidence that vaccination is the most effective method of stemming the spread of communicable disease.  They cite no evidence showing when the City achieved a high rate of vaccination—that is whether it was achieved without the need for a vaccine mandate.  Nor do they cite evidence to support their contention that the high rate of vaccination made the Policy unnecessary to further the City's interest in fighting off the spread of disease.

## V.    Conclusion

Plaintiffs fail to show direct evidence of discrimination.  They also have not shown that they were treated differently based on their religions.  Individuals asserting the same religious beliefs as Plaintiffs were granted exemptions from the

46

City's COVID-19 vaccine mandate.  The City is therefore entitled to summary judgment on Plaintiffs' ELCRA disparate treatment claim (Count II).

The City's Policy is neutral and generally applicable.  Plaintiffs do not show that it fails rational basis review.  Nor do they show that it fails strict scrutiny review.  Therefore, the City also is entitled to summary judgment as to Plaintiffs' First Amendment free exercise claim (Count III).

Accordingly,

**IT IS ORDERED** that the City's motion for partial summary judgment (ECF No. 92) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to stay summary judgment motion briefing (ECF No. 90) is **DENIED AS MOOT**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 18, 2026

47